Power Home Solar, LLC v. Sigora Solar, LLC, 2021 NCBC 36.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20 CVS 7165

POWER HOME SOLAR, LLC, a
Delaware limited liability company,

Plaintiff,

v.

SIGORA SOLAR, LLC, a Virginia
limited liability company; TANYA
HALL, individually; KELSEY
SKIDMORE, individually; HARRIS
PARKER SCHRAM, individually;
and BEN PARRISH, individually,

Defendants.

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO
DISMISS**

1.     **THIS MATTER** is before the Court on the 29 July 2020 filing of Defendants' Motion to Dismiss (the "Motion") pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure (the "Rule(s)").  (ECF No. 18.)

2.     For the reasons set forth herein, the Court **GRANTS** in part and **DENIES** in part the Motion.

> *The Law Office of B. Elizabeth Todd, PLLC, by Elizabeth Todd, and DarrowEverett, LLP, by Thomas Mail Carlotto and Hannah L. Sfameni, for Plaintiff Power Home Solar, LLC.*
>
> *Troutman Pepper Hamilton Sanders LLP by Rachel Buck, Ryan J. Strasser, and Mackenzie Willow-Johnson, for Defendants Sigora Solar, LLC, Tanya Hall, Kelsey Skidmore, Harris Parker Schram, and Ben Parrish.*

Robinson, Judge.

## I.     INTRODUCTION

3.     This matter arises out of individual Defendants' termination of their employment with Plaintiff Power Home Solar, LLC ("Power Home") and their

subsequent employment with Power Home's competitor, Defendant Sigora Solar, LLC ("Sigora"), allegedly in violation of Power Home's restrictive covenants and policies.

## II. FACTUAL BACKGROUND

4. The Court does not make findings of fact on a motion brought pursuant to Rule 12(b)(6) but instead only recites those facts included in the Complaint relevant to the Court's determination of the Motion.

5. Power Home is a limited liability company formed under the laws of the State of Delaware with its principal place of business in North Carolina. (Verified Compl. & Mot. Prelim. & Permanent Inj. ¶ 1, ECF No. 3 ["Compl."].) Power Home is a solar energy company that designs, sells, and installs solar systems to homeowners and commercial businesses. (Compl. ¶¶ 15–16.)

6. Sigora is a limited liability company formed under the laws of the State of Virginia with its principal place of business in Virginia. (Compl. ¶ 2.) Sigora is a renewable energy company which competes with Power Home. (Compl. ¶¶ 32–33.)

7. Defendants Tanya Hall ("Hall"), Kelsey Skidmore ("Skidmore"), Harris Parker Schram ("Schram"), and Ben Parrish ("Parrish," with Hall, Skidmore, and Schram, collectively, the "Former Employees," and Former Employees with Sigora, collectively, "Defendants") are employees of Sigora. (Compl. ¶¶ 5, 7, 10, 64, 75.) The Former Employees all worked at Power Home before they began their employment with Sigora. (Compl. ¶¶ 51, 56, 58, 61, 64, 66, 68.)

8.     On 1 April 2019, Parrish executed a form agreement titled Restrictive Covenants and Invention Assignment Agreement with Power Home (the "Employment Agreement"). (Compl. ¶ 36.) On 3 April 2019, Schram separately executed with Power Home an identical form Employment Agreement. (Compl. ¶ 35.) The Employment Agreement includes nondisclosure, noncompete, and non-solicitation provisions.

9.     The noncompete provision in the Employment Agreement (the "Noncompete Provision") reads as follows:

> **Section 2 – Restrictive Covenant of Non-Competition.**  Employee agrees that during Employee's employment with [Power Home] and for a period of twelve (12) months following Termination, that he/she will not, directly or indirectly, enter into or engage in any employment or business (including any business or competitive organization owned in whole or in part by Employee) involving the Business of the Company within the Restricted Areas.

(Compl. Ex. C § 2 ["Schram Agreement"]; Compl. Ex. D § 2 ["Parrish Agreement"] (emphasis in originals).) "Restricted Areas," as used in the Employment Agreement, is defined as "a 100 mile radius from each location of [Power Home]." (Compl. ¶ 40.)

10.     The Employment Agreement also prohibits Schram and Parrish from soliciting Power Home customers, employees, and contractors during and after their employment. (Compl. ¶ 41.) Specifically, the non-solicitation provision in the Employment Agreement (the "Non-Solicitation Provision") provides:

> **Section 4 – Restrictive Covenant Against Solicitation of Employees or Contractors.**  Employee agrees that during Employee's employment with [Power Home] and for a period of twelve (12) months following Termination, that he/she will not engage or attempt to engage any employee of [Power Home] to perform any work or induce or attempt

to induce any employee of [Power Home] to leave employment, or a contractor to sever a relationship with [Power Home].

(Schram Agreement § 4; Parrish Agreement § 4 (emphasis in originals).)

11. Hall and Skidmore signed similar agreements on 3 March 2017 and 1 February 2017, respectively. (Compl. ¶¶ 42, 44.) It is standard practice for employees of Power Home to execute similar agreements. (Compl. ¶ 43.)

12. On 29 April 2017, Sigora was formed. (Compl. ¶ 30.) On 13 June 2019, Sigora applied for a Certificate of Authority to conduct business in North Carolina. (Compl. ¶ 31.) Power Home alleges that Sigora sought the Certificate of Authority in efforts to compete with Power Home in North Carolina. (Compl. ¶ 53.)

13. Power Home contends that Sigora has in the past and continues to solicit current employees of Power Home, including some of the Former Employees, to leave Power Home to work for Sigora in violation of their obligations to Power Home. (Compl. ¶¶ 49, 55, 60, 65, 69.) Power Home alleges that Sigora and Hall are taking part in a "scheme" to solicit employees from Power Home who are bound by restrictive covenants similar to those contained in the Employment Agreement. (Compl. ¶ 54.)

14. Hall was formerly employed at Power Home as the Vice President of Operations. (Compl. ¶ 51.) In that role, Hall had access to Power Home's confidential and trade secret information, including marketing plans and strategies, the vendor and supplier database, information regarding Power Home's direct relationships with vendors and suppliers, customer database and lists, and pricing models. (Compl. ¶ 52.) Hall began working for Sigora as its Senior Vice President of Operations on or about 1 January 2019. (Compl. ¶ 51.)

15.     Parrish worked for Power Home as a Field Energy Consultant in North Carolina, Virginia, and South Carolina from 25 June 2018 through the termination of his employment on 6 March 2020. (Compl. ¶¶ 66–67.) In that position, Parrish had access to Power Home's confidential and trade secret information, including Power Home's customer list, customers' needs, and customers' contact information. (Compl. ¶ 67.) Parrish began his employment with Sigora as a sales representative shortly after his employment with Power Home was terminated. (Compl. ¶ 68.)

16.     Skidmore worked as the Interconnections Manager at Power Home from 1 February 2017 through 8 February 2019 and "covered" Power Home's territory nationally, including North Carolina. (Compl. ¶ 56.) In that position, Skidmore had access to Power Home's confidential and trade secret information, including Power Home's customer database and lists, contacts within local power companies, and energy purchase agreements. (Compl. ¶ 59.) Shortly after Skidmore's employment with Power Home ended, on or about 8 February 2019, Skidmore began employment with Sigora as its Interconnection Supervisor. (Compl. ¶¶ 57–58.)

17.     Schram worked for Power Home from 1 August 2016 through 21 June 2019. (Compl. ¶ 61.) At the time Schram's employment at Power Home was terminated, Schram was working as a Project Engineering and Design Manager. (Compl. ¶ 62.) In that position, Schram had access to Power Home's confidential and trade secret information, including Power Home's design and installation methods for solar systems and its customer database. (Compl. ¶ 63.) Shortly after Schram's

employment with Power Home ended, on 21 June 2019, Schram began employment with Sigora as its Residential PV Designer Manager. (Compl. ¶ 64.)

18. Hall and Sigora solicited Skidmore, Schram, and Parrish to leave Power Home to work for Sigora. (Compl. ¶¶ 55, 60, 69.) Parrish solicited a Power Home sales representative, Steven Lynch ("Lynch"), to work for Sigora while Lynch was working at Power Home. (Compl. ¶ 70.)

19. The agreements signed by Hall, Schram, and Parrish required them to return all Power Home equipment and materials. (Compl. ¶¶ 41–42.)

20. Power Home stores all of its confidential information and trade secrets on its company computers and mobile phones it provides to certain employees. (Compl. ¶ 26.) Those employees included the Former Employees. (Compl. ¶ 27.) Power Home alleges that the Former Employees obtained Power Home's trade secrets and other confidential information prior to leaving their employment with Power Home. (Compl. ¶ 71.)

21. Power Home's confidential information includes a developed system and proprietary training method used to identify and qualify potential customers and the proprietary practices, methods, techniques, and pricing models Power Home provides its employees to enable its sales representatives to obtain new orders on behalf of Power Home. (Compl. ¶¶ 20, 24.)

22. Power Home's confidential information also includes its "Solar Edge" training, its customer databases, the Power Home SalesForce database, quote software, sales memos and training manuals, and information regarding Power

Home's relationship with its suppliers and vendors. (Compl. ¶¶ 98, 145.) The Former Employees are currently working for Sigora, and Power Home contends that Defendants are still wrongfully competing with Power Home. (Compl. ¶¶ 75, 79.) Power Home further alleges that Defendants are using Power Home's trade secrets and confidential information in a competing renewable energy business. (Compl. ¶ 72.)

## III.    PROCEDURAL BACKGROUND

23.    The Court sets forth here only those portions of the procedural history relevant to its determination of the Motion.

24.    Power Home initiated this action on 18 May 2020. Defendants filed the Motion and Defendants' Memorandum of Law in Support of Their Motion to Dismiss (the "Brief in Support") on 29 July 2020. (Defs.' Mem. Law Supp. Mot. Dismiss, ECF No. 20 ["Br. Supp."].)

25.    On 17 September 2020, Power Home filed Plaintiff's Response in Opposition to Defendants' Motion to Dismiss and Memorandum of Law in Support (the "Response Brief"). (Pl.'s Resp. Opp. Defs.' Mot. Dismiss & Mem. Law Supp., ECF No. 37 ["Resp. Br."].)

26.    Defendants filed Defendants' Reply Memorandum of Law in Support of Their Motion to Dismiss on 30 September 2020. (ECF No. 41.)

27.    The Court held a hearing on the Motion on 23 November 2020. (*See* ECF No. 56.)

28.     On 20 January 2021, the Court conducted a status conference to, in part, address choice of law issues related to the Employment Agreement that were not raised by Power Home or Defendants in their initial briefing on the Motion or in their arguments at the 23 November 2020 hearing.  (*See* ECF No. 74.)  After receiving input from the parties, (ECF No. 77), the Court set a supplemental briefing schedule concerning choice of law, (ECF No. 78).

29.     On 12 February 2021, Power Home filed Plaintiff's Opposition to Defendants' Motion to Dismiss Under Michigan Law ("Power Home's Choice of Law Brief").  (Pl.'s Opp. Defs.' Mot. Dismiss Under Michigan Law, ECF No. 84 ["Pl.'s Choice of Law Br."].)  On 26 February 2021, Defendants filed Defendants' Joint Response Brief in Support of Defendants' Motion to Dismiss.  (ECF No. 91.)

30.     On 27 April 2021, the Court held a hearing on the issues raised in the parties' briefing regarding choice of law.  (ECF No. 92.)The Motion is ripe for resolution.

## IV.    LEGAL STANDARD[1]

31.     "A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint by presenting 'the question whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief can be granted under some [recognized] legal theory.' "  *Forsyth Mem'l Hosp., Inc. v.*

---

[1] In the Response Brief, Power Home cites to *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). (Resp. Br. § I.)  The Court notes that the federal pleading standard established in those cases is a different and higher pleading standard than North Carolina's notice pleading standard, which is applicable here.  *Fox v. Johnson*, 243 N.C. App. 274, 285 (2015); *Edwards v. Vanguard Fiduciary Tr. Co.*, 2018 NCBC LEXIS 237, at *28 fn. 6 (N.C. Super. Ct. Dec. 21, 2018).

*Armstrong World Indus., Inc.*, 336 N.C. 438, 442 (1994) (quoting *Lynn v. Overlook Dev.*, 328 N.C. 689, 692 (1991)). Accordingly, the Court must view allegations in the Complaint "in the light most favorable to the non-moving party." *See Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5 (2017) (quoting *Kirby v. N.C. Dep't of Transp.*, 368 N.C. 847, 852 (2016)). Further, "the complaint is to be liberally construed, and the trial court should not dismiss the complaint unless it appears beyond doubt that [the] plaintiff could prove no set of facts in support of his claim which would entitle him to relief." *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431 (2008) (quoting *Meyer v. Walls*, 347 N.C. 97, 111–12 (1997)).

32. The Court "can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Moch v. A.M. Pappas & Assocs., LLC.*, 251 N.C. App. 198, 206 (2016) (citation omitted). The Court may consider these attached or incorporated documents without converting the Rule 12(b)(6) motion into a motion for summary judgment. *Id.* (citation omitted).

33. Our Supreme Court has noted that "[i]t is well-established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.' " *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (quoting *Wood v. Guilford Cty.*, 355 N.C. 161, 166 (2002)). This standard of review for Rule 12(b)(6) is the standard our Supreme Court "uses

routinely . . . in assessing the sufficiency of complaints in the context of complex commercial litigation." *Id.* at 615 n.7 (citations omitted).

## V.    ANALYSIS[2]

34.    Power Home asserts numerous claims for relief against Defendants stemming from Schram's and Parrish's alleged breach of the form Employment Agreement and Defendants' alleged misappropriation of Power Home's confidential and trade secret information in pursuit of their competing business at Sigora. The Complaint contains the following thirteen "Counts": (1) breach of contract against Schram and Parrish; (2) aiding and abetting breach of contract against Sigora, Hall, and Parrish; (3) misappropriation of trade secrets in violation of 18 U.S.C. §§ 1831 *et seq.* against Defendants; (4) aiding and abetting misappropriation of trade secrets in violation of 18 U.S.C. §§ 1831 *et seq.* against Sigora and Hall; (5) misappropriation of trade secrets in violation of N.C.G.S. §§ 66-152 *et seq.* against Defendants; (6) unfair and deceptive trade practices in violation of N.C.G.S. §§ 75-1.1 *et seq.* against Defendants; (7) common law unfair competition against Defendants; (8) civil conspiracy against Defendants; (9) tortious interference with contract against Sigora and Hall; (10) turnover of property and accounting against Defendants; (11) unjust enrichment against Defendants; (12) preliminary and permanent injunctive relief

---

[2] In the briefing and at both hearings, the parties made reference to matters outside the Complaint, which is not proper for the Court's consideration of the Motion pursuant to Rule 12(b)(6). *Moch*, 251 N.C. App. at 206 (providing that on a Rule 12(b)(6) motion, the Court is limited to considering the complaint and its attachments and consideration outside those documents would result in converting the motion to one for summary judgment). In the determination of the Motion, the Court limits its consideration to the allegations in the Complaint and its attached exhibits.

against Defendants; and (13) punitive damages against Defendants. Defendants seek dismissal of all claims.

35. While Defendants do not specifically address each claim for relief in Defendants' Brief in Support, Defendants contend that all of the claims for relief, are "all predicated in one way or another on either the breach of contract or trade secret claims, [and] fail in their own right. Therefore, the Complaint should be dismissed in its entirety with prejudice." (Br. Supp. 2.)

## A. **Applicable Law**

36. As a preliminary matter, the Court must first determine the law applicable to the claims raised in the Complaint. The Employment Agreement includes a Michigan choice of law provision, which states that the Employment Agreement, "and all transactions contemplated by [the Employment Agreement], shall be governed by, construed and enforced in accordance with the laws of the State of Michigan." (Schram Agreement § 13; Parrish Agreement § 13.) Based on this provision, Power Home contends that Michigan law should apply to all claims brought against Parrish and Schram as the only two Defendants that are alleged to have breached the form Employment Agreement.[3]

37. The general rule in North Carolina is that "where parties to a contract have agreed that a given jurisdiction's substantive law shall govern the interpretation of

---

[3] Power Home's Choice of Law Brief is unclear as to whether Power Home believes Michigan law should apply to all claims asserted against all Defendants or only certain Defendants. At the 27 April 2021 hearing, Power Home's counsel confirmed that Power Home only requests that the Court apply Michigan law to the claims asserted against Schram and Parrish.

the contract, such a contractual provision will be given effect." *Tanglewood Land Co. v. Byrd*, 299 N.C. 260, 262 (1980). North Carolina courts will not enforce a choice of law provision where "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice," or "application of the law of the chosen state would be contrary to a fundamental policy" of North Carolina. *Cable Tel Servs., Inc. v. Overland Contr., Inc.*, 154 N.C. App. 639, 642–43 (2002) (citing Restatement (Second) of Conflict of Laws § 187 (1971)).

38. The record does not reflect that Power Home, Parrish, or Schram have a substantial relationship, or any relationship at all, with Michigan. [4] Power Home is a Delaware limited liability company with its principal place of business in North Carolina. (Compl. ¶ 1.) Schram and Parrish are residents of North Carolina. (Compl. ¶¶ 8–9.) Parrish's work for Power Home was limited to North Carolina "and occasionally Virginia and South Carolina[.]" (Compl. ¶ 67.) Schram's work "covered [Power Home] nationally in all states where [Power Home] conducted business, including North Carolina[.]" (Compl. ¶ 63.) Aside from the Michigan choice of law provision and a general allegation that Schram works in every state where Power Home conducts business without specifically identifying those states, the record does not reveal any substantial relationship between the parties and Michigan. *See Cable Tel. Servs.*, 154 N.C. App. at 643–44 (stating that when the only connection with a

---

[4] Power Home's Choice of Law Brief provides that Power Home "began doing business in Michigan in April 2017 and has since maintained its second headquarters in Michigan." (Pl.'s Choice of Law Br. 2.) A statement in a brief, without any support in the record, is insufficient to support Power Home's contention that the parties have a substantial relationship with Michigan.

state was the choice of law provision itself, the record showed "no relationship" with the state).

39. In consideration of these facts, the Court concludes that there is not a substantial relationship between Power Home, Schram, and Parrish and the State of Michigan. Power Home is headquartered in North Carolina, the Former Employees are North Carolina residents, and the dispute arises out of the Former Employees' competitive conduct in North Carolina; and therefore, North Carolina law is properly applied. *See Triad Packaging, Inc. v. SupplyONE, Inc.*, 925 F. Supp. 2d 774, 786 (W.D.N.C. 2013) (applying North Carolina law, despite a Delaware choice of law provision, to a breach of contract claim between two North Carolina entities when most of the negotiations occurred in North Carolina); *Cable Tel. Servs.*, 154 N.C. App. at 645 (applying North Carolina law to a breach of contract claim when the record before the Court revealed "no connection between the[] parties or the contract and the State of Colorado," but revealed that the contract was entered into in North Carolina).

40. The Court further concludes that even if a substantial relationship with Michigan did exist, the choice of law provision in the Employment Agreement has been waived. Waiver is "an intentional relinquishment of a known right" and may occur expressly or "by conduct which naturally and justly leads the other party to believe that he has so dispensed with the right." *Guerry v. Am. Tr. Co.*, 234 N.C. 644, 648 (1951).

41. Waiver of a choice of law provision by conduct may occur when parties rely on other law throughout the litigation. *See Cargill, Inc. v. Charles Kowsky Res., Inc.*, 949 F.2d 51, 55 (2d Cir. 1991) (declining to apply a Massachusetts choice of law provision and concluding that the parties consented to the application of New York law when both parties consistently relied on New York law in summary judgment submissions to the district court and court of appeals); *Fid. & Deposit Co. of Md. v. Krebs Eng'rs*, 859 F.2d 501, 504 (7th Cir. 1988) (concluding that the defendant "waived any dependence on California law" when it "relied solely on Wisconsin law" in litigating contract damages issues); *Smithkline Beecham Corp. v. Abbott Labs.*, 2017 U.S. Dist. LEXIS 39264, *16 (M.D.N.C. Mar. 20, 2017) ("[C]hoice-of-law provisions can be waived when parties rely on other law throughout the litigation."); *Irwin v. Fed. Express Corp.*, 2016 U.S. Dist. LEXIS 167312, at *9 fn. 2 (M.D.N.C. Dec. 5, 2016) (concluding that the parties waived a choice of law provision where neither party cited to the provision or sought to rely on it).

42. Power Home did not contemplate or request the application of Michigan law until the Court inquired into the choice of law provision in the Employment Agreement at the 20 January 2021 status conference. Citing to North Carolina law on fourteen separate occasions, the Complaint explicitly raises claims under North Carolina law, including the North Carolina Trade Secrets Protection Act, N.C.G.S. §§ 66-152 *et seq.*; the North Carolina Unfair and Deceptive Trade Practices Act N.C.G.S. §§ 75-1.1 *et seq.*; and North Carolina common law. While Power Home attached the Employment Agreement containing a Michigan choice of law provision, there is no

reference to Michigan law within the four corners of the Complaint. Furthermore, Power Home submitted its twenty-three-page Response Brief citing to North Carolina law and made arguments applying North Carolina law at the 23 November 2020 hearing. There is also no citation or reference to Michigan law in the Response Brief.

43. Power Home's reliance on North Carolina law from the initiation of this action until the Court's 20 January 2021 status conference nearly six months later effects a waiver of the Michigan choice of law provision in the Employment Agreement. North Carolina law will therefore govern the substance of this Motion. *See First Union Nat'l Bank v. Brown*, 166 N.C. App. 519, 527 (2004) ("Since the parties in this case both assume the applicability of North Carolina common law, we will proceed accordingly.")

44. Additionally, application of North Carolina law does not raise due process concerns. Indeed, at the April hearing concerning choice of law, counsel for Power Home represented that there is no material difference between applicable Michigan law and applicable North Carolina law. In the absence of that difference, application of North Carolina law does not violate the parties' due process rights. *Wedderburn Corp. v. Jetcraft Corp.*, 2015 NCBC LEXIS 105, at *13 (N.C. Super. Ct. Nov. 6, 2015) (citing *Stetser v. TAP Pharm. Prods. Inc.*, 165 N.C. App. 1, 16 (2004) ("[T]he trial court's unsubstantiated choice to apply North Carolina law to the plaintiffs' claims does not violate defendants' due process rights unless a material difference exists between North Carolina law and the law of another jurisdiction connected with this lawsuit.")). Due to the lack of substantial relationship between the parties and the

transaction and Michigan, Power Home's waiver of the choice of law provision, and in consideration of due process rights, the Court applies North Carolina substantive law to Power Home's claims.

## B. Breach of Contract Against Schram and Parrish

45. Count 1 of the Complaint is Power Home's claim for breach of contract against Schram and Parrish for their alleged breach of the Employment Agreement. (Compl. 12–13.) Schram and Parrish make a number of arguments in support of their request for dismissal of the breach of contract claim. (*See generally* Br. Supp. 6–12.)

### 1. Lack of Consideration

46. As an initial matter, Defendants contend that Power Home's breach of the Employment Agreement claim against Schram and Parrish fails because Power Home "failed to provide new valuable consideration to Schram and Parrish, who had already commenced employment, rendering the [covenants in the Employment Agreement] unenforceable." (Br. Supp. 11.)

47. Schram's Employment Agreement was electronically signed on 3 April 2019 after Schram's employment with Power Home began on or about 1 August 2016. (Compl. ¶¶ 35, 61; *see generally* Schram Agreement.) Parrish's Employment Agreement was electronically signed on 1 April 2019 after Parrish's employment with Power Home began on 25 June 2018. (Compl. ¶¶ 36, 66; *see generally* Parrish Agreement.) "If [an] agreement is entered into after the creation of the employment relationship, it must be supported by new consideration beyond the promise of

continued at-will employment." *Addison Whitney, LLC v. Cashion*, 2017 NCBC LEXIS 23, at \*24–25 (N.C. Super. Ct. Mar. 15, 2017).

48. The Employment Agreement provides as follows:

> **WHEREAS,** [Power Home] desires to engage the Employee in conducting its current and future business, but only if the Employee agrees to the restrictive covenants set forth [in the Employment Agreement]. In exchange for Employee's execution of this Agreement, [Power Home] will employ Employee on an at-will basis. Employee acknowledges that in the course of such employment, Employee may be provided with training and with access to [Power Home's] Confidential Information, including but not limited to, knowledge of [Power Home's] customer contacts, prospective customers, pricing and products; and

> **WHEREAS,** Employee acknowledges he/she has received valuable and sufficient consideration for execution of this Agreement.

(Schram Agreement 1; Parrish Agreement 1 (emphasis in original).)

49. Nothing on the face of the Complaint compels the conclusion that the Schram and Parrish agreements lack consideration. Thus, the Court declines to dismiss the breach of contract claim on the basis of a purported lack of consideration. *Beam v. Sunset Fin. Servs.*, 2019 NCBC LEXIS 56, at \*28 (N.C. Super. Ct. Sept. 3, 2019) ("Rather, only where the complaint calls into question whether there was mutual assent to the contract or proper consideration should the Court consider those elements of contract formation at such an early stage in litigation."); *see also Hejl v. Hood, Hargett & Assocs.*, 196 N.C. App. 299, 304 (2009) (indicating additional training may be new and separate consideration); *S. Fastening Sys. v. Grabber Constr. Prods.*, 2015 NCBC LEXIS 42, at \*18 (N.C. Super. Ct. Apr. 28, 2015)

(providing access to new confidential information can constitute consideration for a nondisclosure agreement).

50.     The Court now turns to the three ways in which Power Home alleges that Schram and Parrish breached the Employment Agreement: (1) using and/or misappropriating Power Home's confidential information and/or trade secrets; (2) competing with Power Home; and (3) soliciting Power Home's current and former employees.  (Compl. ¶ 85.)

51.     To plead a claim for breach of contract, Power Home must allege the "(1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26 (2000).  "[S]tating a claim for breach of contract is a relatively low bar." *Vanguard Pai Lung, LLC v. Moody*, 2019 NCBC LEXIS 39, at *11 (N.C. Super. Ct. June 19, 2019).

### 2.     The Nondisclosure Provision

52.     The Employment Agreement includes the following nondisclosure provision (the "Nondisclosure Provision"):

> Employee agrees he/she will not at any time whatsoever: (1) use any Confidential Information outside the scope of employment; (2) reveal or disclose Confidential Information to any person, firm, corporation or other entity other than [Power Home]; or (3) remove or aid in the removal of any Confidential Information from [Power Home's] premises.

(Schram Agreement § 1; Parrish Agreement § 1.)  Confidential Information is defined by the Employment Agreement (hereinafter "Confidential Information") to include the following:

> vendors lists and information, client and customer lists, [Power Home's] information, studies, software, processes, plans, programs, products,

forms, now or hereafter created or owned by [Power Home], as well as any product and service pricing information, books, records, reports, writings, notes, notebooks, computer programs, sketches, drawings, blueprints, prototypes, formulas, photographs, negatives, models, equipment, reproductions, proposals, flow sheets, supply contracts and other documents and/or things relating in any manner to the Business of the Company and its subsidiaries and affiliates[.]

(Schram Agreement 1; Parrish Agreement 1.)

53. Power Home alleges that Schram and Parrish had access to Power Home's Confidential Information and Schram and Parrish obtained the Confidential Information before terminating their employment with Power Home to conduct business with Sigora. (Compl. ¶¶ 27–28, 63, 67, 72.)

54. Schram joined Sigora on 21 June 2019, and Parrish joined Sigora on 6 March 2020. (Compl. ¶¶ 64, 68.) Power Home alleges that Schram and Parrish have used and continue to use Power Home's Confidential Information in Sigora's renewable energy business. (Compl. ¶¶ 72, 79.)

55. Viewing the allegations in the Complaint in the light most favorable to Power Home, the Court concludes that Power Home's allegations that Schram and Parrish signed the Employment Agreement agreeing to the Nondisclosure Provision, had access to and acquired Power Home's Confidential Information, and improperly used Power Home's Confidential Information in the course of their employment with Sigora are sufficient to state a claim for breach of the Nondisclosure Provision.

Accordingly, the Court DENIES the Motion to the extent it requests dismissal of the claims against Schram and Parrish for breach of the Nondisclosure Provision.

### 3. Overbreadth of the Noncompete Provision and the Non-Solicitation Provision

56. Next, the Court turns to Defendants' contention that the Noncompete Provision and Non-Solicitation Provision are overbroad and therefore unenforceable. (Br. Supp. 6–11.) To be enforceable under North Carolina law, non-competition and non-solicitation clauses between an employer and employee must be: "(1) in writing; (2) made part of a contract of employment; (3) based on valuable consideration; (4) reasonable both as to time and territory; and (5) not against public policy." *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 649–50 (1988). "The elements are the same for non-competition and non-solicitation clauses, but the latter are more easily enforced, as their restraints on employees are generally more tailored and less onerous on employees' ability to earn a living." *Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42, at *30–31 (N.C. Super. Ct. Nov. 3, 2011).

57. Covenants not to compete are "not viewed favorably in modern law." *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 508 (2004) (citation omitted). "Where a covenant is too broad to constitute a reasonable protection of the employer's business, it will not be enforced." *Akzo Nobel Coatings*, 2011 NCBC LEXIS 42, at *29. "The

reasonableness of a restraining covenant is a matter of law for the court to decide." *Jewel Box Stores Corp. v. Morrow*, 272 N.C. 659, 663 (1968).

58.     The Noncompete Provision prohibits Schram and Parrish from "directly or indirectly" entering into or engaging in employment or business "involving the Business of the Company within Restricted Areas." (Schram Agreement § 2; Parrish Agreement § 2.) The Employment Agreement defines "Business of the Company" as the "sale, marketing, and installation of solar and roofing products and services on both a residential and commercial basis throughout the United States." (Schram Agreement 1.; Parrish Agreement 1.) The Employment Agreement defines "Restricted Areas" as "a 100 mile radius from each location of" Power Home. (Schram Agreement 2; Parrish Agreement 2.)

59.     "[O]ur appellate courts consistently hold non-compete agreements purporting to prohibit a former employee from having any association with a business providing similar services, including performing even wholly unrelated work[,] to be overbroad and unenforceable." *Cty. of Wake PDF Elec. & Supply Co., LLC v. Jacobsen*, 2020 NCBC LEXIS 103, at *18 (N.C. Super. Ct. Sept. 9, 2020) (citations and internal quotation marks omitted). North Carolina courts have routinely refused to enforce noncompete provisions that prohibit former employers from "indirectly" working for a competitor or similar business. *VisionAIR*, 167 N.C. App. at 508–09 (concluding that a noncompete provision that stated an employee may not "own, manage, be employed by or otherwise participate in, directly or indirectly, any business similar to" the employer's was overbroad and thus unenforceable); *NFH, Inc.*

*v. Troutman*, 2019 NCBC LEXIS 66, at \*38–39 (N.C. Super. Ct. Oct. 29, 2019) (concluding that a noncompete that prohibited the employee from competing "directly or indirectly" with the former employer "in any manner" was unreasonably broad); *see also PDF Elec. & Supply Co.*, 2020 NCBC LEXIS 103, at \*18 ("Particularly problematic are covenants that restrict an employee from 'directly or indirectly' having any association with a competing business."); *Akzo Nobel Coatings*, 2011 NCBC LEXIS 42, at \*31–32 ("North Carolina courts have refused to enforce noncompetition clauses using the terms 'directly or indirectly.' ").

60. The Noncompete Provision prohibits Parrish or Schram from doing work wholly unrelated to the work they did while at Power Home at any business entity that "involves" the sale, marketing, and installation of solar and roofing products and services. The Noncompete Provision further prohibits "engagement" or "business" with a competitor, prohibiting Schram and Parrish from even purchasing solar and roofing products from a competitor in the Restricted Areas, as defined by the Employment Agreement. The Complaint does not reveal any legitimate business purpose for a noncompete provision of this breadth.

61. Additionally, the Complaint does not include allegations that could show the geographic restriction in Parrish's Noncompete Provision is reasonable. Parrish only worked for Power Home in North Carolina, Virginia, and South Carolina. (Compl. ¶ 67.) The Noncompete Provision prohibits Parrish from working in a 100-mile radius from any Power Home location, notwithstanding the fact that Parrish only worked in three states. Power Home, a company with national presence,

effectively bars Parrish from working in geographic territory far exceeding the three states that Parrish worked in while employed at Power Home.

62.     Considering the geographic and temporal scope and the prohibited activity, the Court concludes that the Noncompete Provision is unreasonably broad. Therefore, the Court GRANTS the Motion and DISMISSES with prejudice[5] Power Home's claim for breach of contract against Schram and Parrish to the extent it is based on the Noncompete Provision.

63.     With respect to the Non-Solicitation Provision, the Complaint is devoid of any factual allegations that Schram solicited any of Power Home's employees. Accordingly, the Court GRANTS the Motion to the extent it is based on Schram's violation of the Non-Solicitation Provision and DISMISSES the claim against Schram with prejudice.

64.     Power Home alleges that Parrish solicited Lynch, a Power Home sales representative to work with Sigora in competition with Power Home.  (Compl. ¶ 70.) The Non-Solicitation Provision states that Parrish cannot "engage or attempt to engage" employees of Power Home "to perform any work or induce or attempt to induce any employee of [Power Home] to leave employment" with Power Home for a

---

[5] "The decision to dismiss an action with or without prejudice is in the discretion of the trial court[.]" *First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191 (2013).

period of twelve (12) months following termination of Parrish's employment.[6] (Parrish Agreement § 4.)

65.    "Courts in North Carolina have recognized that reasonable restrictions on a former employee's right to solicit an employer's current employees are enforceable." *Wells Fargo Ins. Servs. USA v. Link*, 2018 NCBC LEXIS 42, at \*26–27 (N.C. Super. Ct. May 8, 2018), *aff'd per curiam*, 372 N.C. 260 (2019) (citing *Kennedy v. Kennedy*, 160 N.C. App. 1, 11–12 (2003)). This Court has dismissed a claim for breach of a non-solicitation clause that prohibited the solicitation of employees "regardless of whether the employees were current Company employees, whether the employees worked in the same territories as [the defendant], whether [the defendant] ever worked with the employees, or whether the employees provided services or developed relationships for [the plaintiff] that would be of value to a competitive business," concluding that the non-solicitation provision was unreasonable. *See Bite Busters, LLC v. Burris*, 2021 NCBC LEXIS 26, at \*17 (N.C. Super. Ct. Mar. 25, 2021).

66.    The Employment Agreement does not limit those "employees" that he is prohibited from soliciting. As such, the Non-Solicitation Provision is similarly broad to that in *Bite Busters* as it prohibits Parrish from soliciting employees that Parrish never interacted with and regardless of whether or not Parrish and the employee

---

[6] Defendants argue that the provision in the Employment Agreement prohibiting the solicitation of Power Home's customers is overbroad and unenforceable. (Br. Supp. 9–10.) However, Power Home does not make any claim against Defendants for breach of the customer non-solicitation provision. Accordingly, the Court declines to make any ruling regarding the enforceability of the customer non-solicitation provision and its ruling herein is strictly limited to the Non-Solicitation Provision as it relates to Power Home's employees and contractors.

were ever employed by Power Home at the same time. Furthermore, the Complaint does not reveal the Non-Solicitation Provision is reasonably necessary to protect any legitimate business interest of Power Home's.

67. Therefore, the Court GRANTS the Motion to the extent it requests dismissal of the claim for breach of the Non-Solicitation Provision and DISMISSES the claim with prejudice.

## C. Aiding and Abetting Breach of Contract

68. Power Home's Count 2 attempts to assert a cause of action for "Aiding and Abetting Breach of Restrictive Covenants Against [Defendants] Sigora, Hall and Parrish." (Compl. 13.) Defendants seek dismissal on grounds that "North Carolina does not recognize an aiding and abetting a breach of contract of [sic] claim[.]" (Br. Supp. 12.)

69. The Court in *Krawiec v. Manly*, 2016 NCBC LEXIS 7, at *39 (N.C. Super. Ct. Jan. 22, 2016), "decline[d] to recognize a cause action for aiding and abetting a breach of contract under North Carolina law" and the Court sees no reason to recognize such a claim now. Accordingly, the Court GRANTS the Motion and DISMISSES with prejudice Power Home's aiding and abetting breach of contract claim.

## D. Misappropriation of Trade Secrets

70. Counts 3 and 5 of the Complaint include causes of action for Defendants' alleged misappropriation of Power Home's trade secrets in violation of state and federal law. (Compl. 14–18, 22–25.) Power Home alleges that Defendants

misappropriated its trade secrets, which Power Home describes as "confidential customer information such as customer names, customer contact information and customer buying preferences and history, [Power Home's] proprietary practices, methods, techniques, and pricing models, confidential customer database, including the entire [Power Home] SalesForce database, and [Power Home's] proprietary quote software, confidential sales memos, sales training manuals, and information concerning [Power Home's] relationship with its suppliers and vendors." (Compl. ¶¶ 100, 147.)

71.     Power Home brings claims for relief pursuant to both the North Carolina Trade Secrets Protection Act (the "NCTSPA"), N.C.G.S. §§ 66-152 *et seq.*, and the federal Defend Trade Secrets Act of 2016 (the "DTSA"), 18 U.S.C. §§ 1832 *et seq.* Defendants contend that Power Home's claims under the NCTSPA and the DTSA fail for the same reasons: Power Home's Complaint does not (1) sufficiently identify a trade secret; or (2) include adequate allegations of misappropriation. (Br. Supp. 12–17.)

72.     The parties did not indicate in their briefing any differences in the analysis to be applied to the two claims. Therefore, the Court addresses Power Home's claims pursuant to the NCTSPA and the DTSA in tandem. *See Syngenta Seeds, LLC v. Warner*, 2021 U.S. Dist. LEXIS 32385, at *31–32 (D. Minn. Feb. 22, 2021) (analyzing claims under the NCTSPA and the DTSA together because the parties' arguments did not "implicate any differences between the DTSA and the NCTSPA" and the parties did not argue or otherwise identify any difference between the respective

statutes); *see also Herrmann Int'l, Inc. v. Herrmann Int'l Eur.*, 2021 U.S. Dist. LEXIS 42277, at *34–38 (W.D.N.C. Mar. 6, 2021) (analyzing claims pursuant to the DTSA and the NCTSPA together).

73.     The NCTSPA defines a trade secret as

> business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> > a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value for its disclosure or use; and
> >
> > b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C.G.S. § 66-152(3).

74.     The DTSA defines a trade secret as

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or if writing if —
>
> > (A) the owner thereof has taken reasonable measures to keep information secret; and
> >
> > (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3).

75.     To plead misappropriation of trade secrets pursuant to North Carolina law, "a plaintiff must identify a trade secret with sufficient particularity so as to enable a

defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Krawiec v. Manly*, 370 N.C. 602, 609 (2018) (quoting *Washburn v. Yadkin Valley Bank & Tr. Co.*, 190 N.C. App. 315, 326 (2008)). General and conclusory allegations without specifically identifying the trade secrets allegedly misappropriated and the acts by which the alleged misappropriation was accomplished are insufficient to state a claim for trade secret misappropriation pursuant to the NCTSPA. *Washburn*, 190 N.C. App. at 327.

76. To plead trade secret misappropriation pursuant to the DTSA, a plaintiff must allege "(1) the existence of a trade secret; (2) that defendant misappropriated the trade secret; and (3) that the trade secret was used or intended for use in interstate commerce." *Heska Corp. v. Qorvo US, Inc.*, 2020 U.S. Dist. LEXIS 180337, at *12–13 (M.D.N.C. Sept. 30, 2020). Similar to the NCTSPA, a plaintiff pursuing a claim under DTSA must identify a trade secret with sufficient particularity. *Syngenta Seeds*, 2021 U.S. Dist. LEXIS 32385, at *32 (providing that under both the DTSA and the NCTSPA, "a plaintiff must identify a trade secret with sufficient particularity"); *see also Lithero, LLC v. Astrazeneca Pharms. LP*, 2020 U.S. Dist. LEXIS 145592, at *2–3 (D. Del. Aug. 13, 2020) ("To adequately plead trade secret misappropriation under the DTSA, 'a plaintiff must identify a trade secret with sufficient particularity so as to provide notice to a defendant of what he is accused of misappropriating[.]' "); *Keystone Transp. Sols., LLC v. Northwest Hardwoods, Inc.*, 2019 U.S. Dist. LEXIS 67102, at *14 (W.D. Va. Apr. 19, 2019) ("As such, the plaintiff

must 'identify, with particularity, each trade secret it claims was misappropriated. This must be done to allow the finder of fact to distinguish that which is legitimately a trade secret from other information that is simply confidential but not a trade secret, or is publicly available information.' ").

77. "[T]he courts of this State routinely dismiss NCTSPA claims broadly asserting that a plaintiff's processes and procedures constitute its trade secrets because, without more, such allegations do not identify with sufficient particularity the trade secrets the defendant allegedly misappropriated." *Bite Busters*, 2021 NCBC LEXIS 26, at *20–21 (citing *Washburn*, 190 N.C. App. at 327; *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 468–69 (2003); *Window Gang Ventures, Corp. v. Salinas*, 2019 NCBC LEXIS 24, at *43 (N.C. Super. Ct. Apr. 2, 2019); and *Edgewater Servs., Inc. v. Epic Logistics, Inc.*, 2009 NCBC LEXIS 21, at *9, 11 (N.C. Super. Ct. Aug. 11, 2009)). Similarly, to plead a claim pursuant to the DTSA, a plaintiff may not "simply list[] categories of alleged trade secrets in broad terms" without identifying a "specific set of methods, techniques, processes, procedures, programs, or codes." *Calendar Research LLC v. StubHub, Inc.*, 2020 U.S. Dist. LEXIS 112361, at *15–18 (C.D. Cal. May 13, 2020) (internal quotation marks omitted); *see also Syngenta Seeds*, 2021 U.S. Dist. LEXIS 32385, at *36 (granting in part a motion to dismiss a trade secret misappropriation claim based on the plaintiff's "high-level plans and budgeting"). The Court concludes Power Home's description of its trade secrets as "proprietary practices, methods, techniques, and pricing models" is not pled with sufficient particularity pursuant to the NCTSPA or the DTSA. Accordingly, to

the extent Power Home's misappropriation of trade secrets claims are based on "proprietary practices, methods, techniques, and pricing models" the Court concludes the Motion should be GRANTED, and Power Home's NCTSPA and DTSA claims based on these alleged trade secrets shall be dismissed with prejudice.

78. Power Home also identifies "information concerning [Power Home's] relationship with its suppliers and vendors" as a trade secret. This Court, citing *Krawiec*, has concluded that the term "supplier information," without more specificity, is insufficient to identify a trade secret under the NCTSPA for purposes of Rule 12. *KNC Techs., LLC v. Tutton*, 2019 NCBC LEXIS 72, at *33–34 (N.C. Super. Ct. Oct. 9, 2019). Furthermore, broadly describing a trade secret using the language "other information regarding" customers or suppliers is likewise insufficient to identify a trade secret pursuant to the DTSA. *See, e.g., TECH USA, Inc. v. Milligan*, 2021 U.S. Dist. LEXIS 37961, at *10 (D. Md. Mar. 1, 2021). The Court concludes that Power Home's description of its trade secret as "information concerning [Power Home's] relationship with its suppliers and vendors" fails to put Defendants on notice of the purported trade secrets they are accused of misappropriating and therefore fatally deficient under the NCTSPA and the DTSA. Accordingly, the Court concludes that the Motion should be GRANTED, and Power Home's NCTSPA and DTSA claims dismissed with prejudice, to the extent they are based on these alleged trade secrets.

79. Power Home also identifies "customer names, customer contact information and customer buying preferences and history," Power Home's "confidential customer database, including the entire [Power Home] SalesForce database, and [Power Home]

proprietary quote software, confidential sales memos, [and] sales training manuals" as allegedly misappropriated trade secrets. (Compl. ¶¶ 100, 147.) Power Home alleges that it "has developed a system for identifying and qualifying potential customers through multiple streams of advertising, marketing partnerships, and other campaigns, including [Power Home's] 'Solar Edge' proprietary training." (Compl. ¶ 20.)

80. This sort of customer, pricing, and sales information may potentially constitute protectible trade secrets pursuant to the DTSA and the NCTSPA, and the Court concludes that Power Home has adequately identified "customer names, customer contact information and customer buying preferences and history," Power Home's "confidential customer database, including the entire [Power Home] SalesForce database, and [Power Home] proprietary quote software, confidential sales memos, [and] sales training manuals" to put Defendants on notice of what information they have allegedly misappropriated at this stage of the proceeding.

81. Accordingly, Power Home's claims as to these alleged trade secrets shall survive dismissal under Rule 12(b)(6). *See Kissinger Fin. Servs. v. Kissinger*, 2021 U.S. Dist. LEXIS 50254, at *20–22 (D. Md. Mar. 17, 2021) (holding that "client lists, client contact and financial information" could have independent economic value and be protectible pursuant to the DTSA), *Krawiec*, 370 N.C. at 610 ("Information regarding customer lists, pricing formulas and bidding formulas can qualify as a trade secret." (cleaned up)); *Ge Betz, Inc. v. Conrad*, 231 N.C. App. 214, 234 (2013) (providing that "pricing information, customer proposals, historical costs, and sales

data" may constitute a trade secret); *ALP Sys. v. Haygood*, 2021 NCBC LEXIS 51, at *24 (N.C. Super. Ct. May 10, 2021) (concluding that the plaintiff identified its trade secrets with sufficient particularity, including the plaintiff's "customer database, its records of the materials, labor, and equipment required for each project, its inspection report form, its operations/maintenance manual, and its Corporate Safety Program & Employee Safety Manual").

82. Defendants also contend that Power Home's trade secret misappropriation claims fail because Power Home does not allege that it took steps to maintain the secrecy of Power Home's trade secrets and some portion of Power Home's trade secrets are publicly available. (Br. Supp. 14–16.) The Court disagrees.

83. Power Home alleges that it maintains its trade secrets on its computers and mobile phones, which are provided to "certain employees." (Compl. ¶ 26.) Power Home further alleges that all of its employees are aware of the terms of the Employment Agreement, it is standard practice for its employees to sign agreements similar to the Employment Agreement, and all Power Home employees are required to sign a similar agreement as a condition of access to Power Home's confidential information. (Compl. ¶¶ 44–45, 113.)

84. Allegations that Power Home limited access to the trade secret information to certain employees and required employees to sign nondisclosure agreements before gaining access to the trade secret information are sufficient under Rule 12 to plead that Power Home took reasonable efforts to maintain the secrecy of its alleged trade secrets. *See DecisionQ Corp. v. GigM Techs., LLC*, 2017 U.S. Dist. LEXIS 227919, at

*19 (E.D. Va. Aug. 9, 2017) (finding that the plaintiffs took reasonable steps to protect the secrecy of trade secret information, consistent with the requirements of the DTSA, by requiring employees to sign nondisclosure agreements and the use of password-protected systems); *Vitaform, Inc. v. Aeroflow, Inc.*, 2020 NCBC LEXIS 132, at *21 (N.C. Super. Ct. Nov. 4, 2020) (concluding that an alleged oral non-disclosure agreement, without more, was sufficient to plead reasonable efforts to maintain the secrecy of a trade secret pursuant to the NCTSPA).

85. Furthermore, even if certain trade secret information of Power Home is publicly available as Defendants allege, a compilation of publicly available information may be a protectible trade secret under the NCTSPA and the DTSA. *IHS Global Ltd. v. Trade Data Monitor, LLC*, 2021 U.S. Dist. LEXIS 101952, at *29 (D.S.C. May 4, 2021) (providing that the law, applying the DTSA, "offers trade secret protection to compilations of publicly available information"); *Koch Measurement Devices, Inc. v. Armke*, 2015 NCBC LEXIS 45, at *13 (N.C. Super. Ct. May 1, 2015) ("[T]he Court of Appeals has held that where an individual maintains a compilation of detailed records over a significant period of time, those records could constitute a trade secret even if 'similar information may have been ascertainable by anyone in the . . . business.' ").

86. Lastly, Defendants contend that Power Home fails to allege misappropriation. (Br. Supp. 16–17.) Misappropriation is defined by the NCTSPA as the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent[.]" N.C.G.S. § 66-152(1). Under North Carolina law, a

plaintiff must identify with specificity "the acts by which the alleged misappropriations were accomplished." *Washburn*, 190 N.C. App. at 327.

87.     Misappropriation is defined by the DTSA as the

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure of use of a trade secret of another without express or implied consent by a person who –

(i) used improper means to acquire knowledge of the trade secret; [or]

(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was –

(I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret[.]

18 U.S.C. § 1839(5).

88.     To plead misappropriation under the DTSA, a claimant "must assert facts establishing an unconsented disclosure or use of a trade secret by one who used improper means to acquire the secret; or, at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret." *C-Ville Fabricating, Inc. v. Tarter*, 2019 U.S. Dist. LEXIS 50373, at *39 (E.D. Ky. Mar. 26, 2019) (citation and internal quotation marks omitted).

89. Power Home alleges that the Former Employees had access to the trade secret information through their employment with Power Home; they now work with Sigora, Power Home's competitor; they obtained Power Home's Confidential Information before leaving their employment with Power Home; they subsequently disclosed trade secret information to Sigora; and they and Sigora have used the trade secret information to solicit Power Home's customers, suppliers, and vendors. (Compl. ¶¶ 27–28, 33, 71–72, 75, 101–03.)

90. In *Wells Fargo Ins. Servs. USA*, 2018 NCBC LEXIS 42, at *40–42, this Court held that although allegations that the defendant accessed the plaintiff's trade secrets through the defendant's employment with the plaintiff, the defendant became employed by a competitor of the plaintiff, and the defendant used the plaintiff's trade secrets to solicit the plaintiff's customers required a "significant inferential leap" to conclude that the defendant misappropriated the plaintiff's trade secrets, they were nonetheless sufficient at the pleading stage. Keeping with this Court's decision in *Wells Fargo* and its subsequent application of *Wells Fargo* in *Strata Solar, LLC v. Naftel*, 2020 NCBC LEXIS 129, at *9–12 (N.C. Super. Ct. Oct. 29, 2020), the Court concludes that Power Home's allegations are sufficient, albeit minimally so, to plead misappropriation pursuant to the NCTSPA.

91. Courts applying the DTSA have found similar allegations sufficient to allege misappropriation. *See Dmarcian, Inc. v. Dmarcian Eur. BV*, 2021 U.S. Dist. LEXIS 99380, at *58 (W.D.N.C. May 26, 2021) (concluding that a plaintiff sufficiently showed misappropriation under the DTSA by showing that even though the

defendant was previously authorized to use the plaintiff's trade secrets, the defendant used the trade secrets "beyond the scope of the parties' agreement"); *see also Syngenta Seeds*, 2021 U.S. Dist. LEXIS 32385, at *39–40 ("Misappropriation is plausible, however, when a departing employee has retained trade secrets under suspicious circumstances and there is reason to believe that the employee has used or disclosed the trade secrets in her new employment."). Accordingly, the Court concludes that for purposes of Rule 12, Power Home has sufficiently alleged misappropriation under the DTSA.

E.   **Aiding and Abetting Misappropriation of Trade Secrets**

92.   Power Home includes in its Complaint a Count 4 titled "Aiding and Abetting Misappropriation of Trade Secrets by Defendants Sigora, and Hall Under the Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.*" (Compl. 18.) Power Home fails to cite to any authority that the DTSA establishes a cause of action for aiding and abetting the misappropriation of trade secrets.[7] The Court's research has revealed none either. Absent compelling authority recognizing such a claim, the Court declines to do so here. *See Infinity Tech., LLC v. Burney*, 2020 U.S. Dist. LEXIS 206604, at *15–16 (E.D. Va. June 4, 2020) (declining to recognize a claim for aiding and abetting misappropriation of trade secrets); *C-Ville Fabricating*, 2019 U.S. Dist. LEXIS 50373, at *43–44 (same). Therefore, the Motion should be GRANTED and Power Home's Count 4 shall be DISMISSED with prejudice.

---

[7] In fact, in Power Home's Choice of Law Brief, it argues that it has sufficiently stated a claim for aiding and abetting breach of fiduciary duty. However, this claim is not pled in the Complaint or before the Court; therefore, the Court declines to address this argument asserted by Power Home. (Pl.'s Choice of Law Br. 6–7.)

**F. Unjust Enrichment**

93. In Count 11 of the Complaint, Power Home asserts a claim for unjust enrichment against all Defendants. (Compl. 29.) In order to state a claim for unjust enrichment, a party must allege: "(1) it conferred a benefit on another party; (2) the other party consciously accepted the benefit; and (3) the benefit was not conferred gratuitously or by an interference in the affairs of the other party." *Worley v. Moore*, 2018 NCBC LEXIS 114, at *25 (N.C. Super. Ct. Nov. 2, 2018) (citing *Se. Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 330 (2002)). "The doctrine of unjust enrichment was devised by equity to exact the return of, or payment for, benefits received under circumstances where it would be unfair for the recipient to retain them without the contributor being repaid or compensated." *Collins v. Davis*, 68 N.C. App. 588, 591 (1984).

94. Defendants contend that Power Home's unjust enrichment claim "fails because there is no allegation of a benefit being conferred on any Defendant." (Br. Supp. 21.) Power Home argues in response that it "clearly allege[s] throughout the Complaint that Defendants received the benefit of utilizing [Power Home's] trade secrets and proprietary information through their intentional solicitation of [Power Home] employees without [Power Home's] consent." (Resp. Br. § VIII.)

95. Power Home alleges in its Complaint that the Former Employees were given Power Home's Confidential Information to perform their job duties at Power Home, that they were legally obligated to maintain the secrecy of Power Home's Confidential Information, that Sigora knew or should have known that the Former

Employees were prohibited from using the Confidential Information in its competing business, and that the Former Employees and Sigora are using Power Home's Confidential Information and trade secrets in conducting a competing business. (Compl. ¶¶ 24, 27, 33, 46, 48, 72.) The Complaint further contains allegations that through this conduct, "Defendants obtained benefits from [Power Home]" and "[g]iven the nature of the alleged conduct and circumstances, it would be unjust to allow Defendants to retain these benefits." (Compl. ¶¶ 192–93.)

96. This Court has held on at least two occasions that allegations of this sort are sufficient to survive dismissal under Rule 12. *See PDF Elec. & Supply Co.*, 2020 NCBC LEXIS 103, at *27–30; *S. Fastening Sys.*, 2015 NCBC LEXIS 42, at *27–28.

97. Accordingly, the Motion should be DENIED as to Power Home's unjust enrichment claim.[8]

### G.   Tortious Interference with Contract

98. In Count 9 of the Complaint, Power Home asserts a tortious interference with contract claim against Sigora and Hall for their alleged tortious interference with the Employment Agreement. (Compl. 27.)

---

[8] In a footnote in their Brief in Support, Defendants argue that "[t]o state its unjust enrichment claim, [Power Home] relies on the same facts underlying its breach of contract claim. Accordingly, should [Power Home's] breach of contract claim survive dismissal, this alternative claim is no longer viable." (Br. Supp. 21.) This Court has on multiple occasions permitted both a breach of contract claim and an alternative unjust enrichment claim to proceed at the Rule 12 stage. *See PDF Elec. & Supply*, 2020 NCBC LEXIS 103, at *29 (treating an analogous unjust enrichment claim as an alternative claim to the claim for breach of a nondisclosure provision); *Brandy v. Gibson*, 2017 NCBC LEXIS 66, at *12 (N.C. Super. Ct. July 26, 2017) ("The Court is unwilling to prevent [the plaintiff's] unjust enrichment claim from moving to discovery because it was not specifically pleaded in the alternative to her breach of contract claim."); *see also Tumlin v. Tuggle Duggins P.A.*, 2018 NCBC LEXIS 217, at *37 (N.C. Super. Ct. Dec. 18, 2018) ("North Carolina law allows a plaintiff to plead alternative theories of recovery based on the same conduct or transaction.").

99. To state a claim for tortious interference with contract, the pleading must contain allegations that

> (1) a valid contract [exists] between the [claimant] and a third person which confers upon the [claimant] a contractual right against a third person; (2) the [opposing party] knows of the contract; (3) the [opposing party] intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; [and] (5) resulting in actual damage to [claimant].

*United Labs., Inc.*, 322 N.C. at 661. "The pleading standards for a tortious interference with contract claim are strict." *Kerry Bodenhamer Farms, LLC v. Nature's Pearl Corp.*, 2017 NCBC LEXIS 27, at *16 (N.C. Super. Ct. Mar. 27, 2017) (cleaned up).

100. The Court has already concluded that Power Home's claim for breach of the Noncompete Provision and the Non-Solicitation Provision should be dismissed due to their overbreadth. Because those provisions are unenforceable, Power Home's claim for tortious interference with contract based on those provisions must fail. *See, e.g., Phelps Staffing, LLC v. C.T. Phelps, Inc.*, 226 N.C. App. 506, 512 (2013) ("Because the noncompetition agreement is unenforceable, the contract cannot support plaintiff's claim for tortious interference with contract[.]"); *Wells Fargo Ins. Servs. USA*, 2018 NCBC LEXIS 42, at *42–44 (dismissing a tortious interference with contract claim to the extent it was based on unenforceable restrictive covenants) (citing *Medical Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 658 (2009) (affirming dismissal of a tortious interference with contract claim based on overbroad and unenforceable restrictive covenants)). Accordingly, the Court concludes that the Motion should be

GRANTED and Power Home's claim for tortious interference with the Noncompete Provision and Non-Solicitation Provision should be DISMISSED with prejudice.

101. Power Home also alleges that Sigora and Hall tortiously interfered with the Employment Agreement by inducing Schram and Parrish to disclose Power Home's confidential and proprietary information. (Compl. ¶ 184.) Defendants contend that Power Home fails to allege that Sigora or Hall had knowledge of the terms of the Employment Agreement and any alleged interference by Sigora or Hall was justified. (Br. Supp. 20.) The Court first addresses Defendants' contention that Power Home fails to allege that Sigora or Hall had knowledge of the terms of the Employment Agreement.

102. "A defendant need not have actual knowledge of the contract for purposes of a tortious interference with contract claim[.]" *Hopkins v. MWR Mgmt. Co.*, 2017 NCBC LEXIS 47, at *53 (N.C. Super. Ct. May 31, 2017). The defendant "has knowledge of the contract" for the purposes of a tortious interference with contract claim "if he knows the facts which give rise to the plaintiff's contractual right against the third person." *Childress v. Abeles*, 240 N.C. 667, 674 (1954). When a defendant is accused of tortiously interfering with an employer-employee contractual relationship, allegations of knowledge of the employment relationship, specifically knowledge of the responsibilities of the employee, may be sufficient to allege knowledge at the Rule 12 stage. *See Veer Right Mgmt. Grp., Inc. v. Czarnowski Display Serv.*, 2015 NCBC LEXIS 13, at *13–14 (N.C. Super. Ct. Feb. 4, 2015). So too may allegations that the defendant executed similar nondisclosure agreements

with its own employees. *See TaiDoc Tech. Corp. v. OK Biotech Co.*, 2016 NCBC LEXIS 26, at *36–37 (N.C. Super. Ct. Mar. 28, 2016).

103. Power Home alleges that Hall entered into an agreement with Power Home similar to the Employment Agreement, that Hall was made aware of the terms of the Employment Agreement, and that Hall has become instrumental in Sigora's "scheme" to expand its solar energy business by using Power Home's Confidential Information. (Compl. ¶¶ 42, 45, 50.) Power Home further alleges that "Sigora also knew or should have known, either directly or indirectly from the Former. . . Employees and/or as is customary in the renewable energy business, that the Former . . . Employees . . . acquired Confidential Information and/or proprietary and/or trade secrets . . . as a result of their employment with [Power Home]." (Compl. ¶ 48.) These allegations, taken as true, are sufficient to plead that Sigora and Hall had knowledge of the terms of the Employment Agreement and, specifically, the Nondisclosure Provision.

104. The Court next turns to Defendants' contention that any alleged interference by Sigora or Hall was justified. A tortious interference with contract claim should be dismissed "when the complaint reveals that the interference was justified or privileged." *Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 220 (1988). When the defendant is acting for a legitimate business purpose, then its actions are privileged. *Id.* at 221. "[C]ompetition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interest and by means that are lawful." *Id.*

105. However, a competitor's privilege may be "lost if exercised for a wrong purpose." *K&M Collision, LLC v. N.C. Farm Bureau Mut. Ins. Co.*, 2017 NCBC LEXIS 109, at *20 (N.C. Super. Ct. Nov. 21, 2017). A party's interference is "without justification" when it is "not reasonably related to the protection of a legitimate business interest." *Privette v. Univ. of N.C. at Chapel Hill*, 96 N.C. App. 124, 134 (1989). "If the defendant's only motive is a malicious wish to injure the plaintiff, his actions are not justified." *Hooks*, 322 N.C. at 221.

106. Power Home's allegations that Defendants misappropriated Power Home's trade secrets and Confidential Information in violation of the Nondisclosure Provision could ultimately support a conclusion that Sigora and Hall's interference with the Employment Agreement was not to protect a legitimate business interest but rather to harm Power Home by interfering with Power Home's contractual relationships with its employees and hiring them away. *See ALP Sys.*, 2021 NCBC LEXIS 51, at *21–23; *see also E-Ntech Indep. Testing Servs. v. Air Masters, Inc.*, 2017 NCBC LEXIS 2, at *17 (N.C. Super. Ct. Jan. 5, 2017) ("The same allegations of wrongful conduct that permit [the plaintiff's] claim for misappropriation of trade secrets to survive [the defendants' motion to dismiss] are likewise sufficient to show that [the defendants'] competition was not through lawful means."); *S. Fastening Sys.*, 2015 NCBC LEXIS 42, at *23–24 (concluding that the plaintiff adequately pleaded a claim for tortious interference with a nondisclosure agreement where plaintiff alleged facts showing that the defendant "improperly acquired, disclosed, and used" the plaintiff's confidential and trade secret information).

107. Accordingly, for the reasons stated herein, the Motion should be DENIED to the extent it requests dismissal of Power Home's claim for tortious interference with the Nondisclosure Provision.

## H. Unfair and Deceptive Trade Practices and Common Law Unfair Competition

108. In Counts 6 and 7 of the Complaint, Power Home alleges that Defendants' conduct constitutes an unfair and deceptive trade practice in violation of N.C.G.S. § 75-1.1 ("UDTPA") and common law unfair competition. (Compl. 25–26.)

109. To state a claim for violation of the UDTPA, a plaintiff must allege that "(1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 353 N.C. 647, 656 (2001). "A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive." *Id.*

110. "The gravamen of unfair competition is the protection of a business from misappropriation of its commercial advantage earned through organization, skill, labor, and money." *Henderson v. U.S. Fid. & Guar. Co.*, 346 N.C. 741, 749 (1997). A common law unfair competition claim may encompass "interference with a competitor's contractual relations, disparagement of a competitor's product or business methods, and misappropriation of a competitor's intangible property rights such as advertising devices or business systems." *Stearns v. Genrad, Inc.*, 564 F. Supp. 1309, 1320 (M.D.N.C. 1983).

111. "Courts have recognized that a claim for common law unfair competition is analyzed as a claim for unfair or deceptive trade practices under [N.C.]G.S. § 75-1.1." *PDF Elec. & Supply Co.*, 2020 NCBC LEXIS 103, at \*26; *see also Global Textile Alliance, Inc. v. TDI Worldwide, LLC*, 2018 NCBC LEXIS 104, at \*23 (N.C. Super. Ct. Oct. 9, 2018) ("The standard which a plaintiff must meet to recover on an unfair competition claim under the common law is not appreciably different from a claim for unfair or deceptive trade practices." (cleaned up)).

112. "[O]ur Courts have long recognized that claims for misappropriation of trade secrets and tortious interference with contract may form the basis of a [UDTPA] claim[.]" *S. Fastening Sys.*, 2015 NCBC LEXIS 42, at \*28. Likewise, conduct amounting to trade secret misappropriation or tortious interference with contract may support a claim for common law unfair competition. *Stearns*, 564 F. Supp. at 1320; *Se. Anesthesiology Consultants, PLLC v. Charlotte-Mecklenburg Hosp. Auth.*, 2019 NCBC LEXIS 107, at \*22 (N.C. Super. Ct. Dec. 13, 2019); *see also PDF Elec. & Supply Co.*, 2020 NCBC LEXIS 103, at \*27 (declining to dismiss a UDTPA claim and common law unfair competition claim because it could be supported by the plaintiff's surviving trade secret misappropriation claim).

113. The Court has concluded that Power Home's claims for trade secret misappropriation and tortious interference with contract survive the Motion, at least in part. Accordingly, the Court concludes that Power Home's claims pursuant to the UDTPA and for common law unfair competition should also survive the Motion and

therefore the Motion to dismiss the UDTPA and unfair competition claims should be DENIED.

I.     **Civil Conspiracy**

114.   In Count 8 of the Complaint, Power Home asserts a claim for civil conspiracy against Defendants. (Compl. 26.) Under North Carolina law, a complaint sufficiently states a claim for civil conspiracy when it alleges "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Elliot v. Elliot*, 200 N.C. App. 259, 264 (2009).

115.   Defendants contend that Power Home's civil conspiracy claim should fail because Power Home "does not allege an underlying wrongful act about which Defendants allegedly conspired." (Br. Supp. 18.)

116.   The Court has determined that Power Home's claims for breach of contract, trade secret misappropriation, unjust enrichment, tortious interference with contract, unfair and deceptive trade practices, and unfair competition survive the Motion, at least in part. The conduct underlying these claims sufficiently provides the underlying unlawful act for the civil conspiracy claim. *Morris Int'l, Inc. v. Packer*, 2021 NCBC LEXIS 16, at *40 (N.C. Super. Ct. Feb. 22, 2021) ("The Court has determined that [the plaintiff's] claims for breach of fiduciary duty, conversion, and unfair trade practices can proceed, providing the required underlying unlawful act.").

117. The Court further concludes that Power Home has adequately alleged the other elements of a civil conspiracy claim, specifically, Defendants' agreement and subsequent actions taken to solicit Power Home employees and use Power Home's Confidential Information to gain competitive advantage over Power Home. (*See* Compl. ¶ 175.)

118. Accordingly, the Court concludes that the Motion to dismiss the civil conspiracy claim should be DENIED.

## J. Turnover of Property, Accounting, Punitive Damages, Injunctive Relief

119. Power Home attempts to assert as causes of actions (1) Count 10 of the Complaint for "Turnover of Property to [Power Home] and for an Accounting [A]gainst Defendants;" (2) Count 12 of the Complaint for "Motion for Preliminary and Permanent Injunctive Relief;" and (3) Count 13 of the Complaint for "Punitive Damages Against Defendants." (Compl. 28–32.)

120. Defendants contend that these purported claims are "remedies, not causes of action." (Br. Supp. 21.) The Court agrees. *See, e.g.*, *Collier v. Bryant*, 216 N.C. App. 419, 434 (2011) ("Punitive damages are available, not as individual cause of action, but as incidental damages to a cause of action."); *Bernard v. Central Carolina Truck Sales, Inc.*, 68 N.C. App. 228, 232 (1984) (describing the return of property as a remedy); *Elhulu v. Alshalabi*, 2021 NCBC LEXIS 44, at *20–22 (N.C. Super. Ct. Apr. 29, 2021) (providing that an accounting "is a remedy, not an independent cause of action"); *Lendingtree, LLC v. Intercontinental Capital Grp., Inc.*, 2017 NCBC

LEXIS 54, at *17 (N.C. Super. Ct. June 23, 2017) (dismissing a "purported cause of action for preliminary injunction" but "without prejudice to [the plaintiff's] ability to pursue whatever remedies it may be entitled to[,]" which could include injunctive relief).

121.    Therefore, the Motion should be GRANTED to the extent Power Home asserts punitive damages, injunctive relief, the turnover of property, and an accounting as claims for relief but the Court's ruling is without prejudice to Power Home's right to seek these remedies should it be entitled to relief under any of its remaining causes of action.

## VI.    CONCLUSION

122.    For the foregoing reasons, the Court hereby **GRANTS** in part and **DENIES** in part the Motion as follows:

    A.    The Court **GRANTS** in part and **DENIES** in part the Motion to the extent it requests dismissal of Count 1 of the Complaint, Power Home's breach of contract claim. The Motion is **DENIED** to the extent it requests dismissal of the claim for breach of the Nondisclosure Provision. The Motion is **GRANTED** to the extent it requests dismissal of the breach of contract claim for any alleged breach of the Noncompete Provision and the Non-Solicitation Provision and the claim to that extent is **DISMISSED** with prejudice.

B.  The Court **GRANTS** the Motion to the extent it requests dismissal of Count 2 of the Complaint, Power Home's aiding and abetting breach of contract claim, and **DISMISSES** the claim with prejudice.

C.  The Court **GRANTS** in part and **DENIES** in part the Motion to the extent it requests dismissal of Counts 3 and 5 of the Complaint, Power Home's claims for trade secret misappropriation pursuant to the NCTSPA and the DTSA. The Court **DENIES** the Motion to the extent the claims are based on Power Home's "customer names, customer contact information and customer buying preferences and history," Power Home's "confidential customer database, including the entire [Power Home] SalesForce database, and [Power Home] proprietary quote software, confidential sales memos, [and] sales training manuals." The Court **GRANTS** in part the Motion and **DISMISSES** with prejudice the trade secret misappropriation claims to the extent the claims are based on "proprietary practices, methods, techniques, and pricing models" and "information concerning [Power Home's] relationship with its suppliers and vendors."

D.  The Court **GRANTS** the Motion to the extent it requests dismissal of Count 4 of the Complaint, Power Home's claim for aiding and abetting misappropriation of trade secrets, and **DISMISSES** the claim with prejudice.

E.   The Court **DENIES** the Motion to the extent it requests dismissal of Count 11 of the Complaint, Power Home's claim for unjust enrichment.

F.   The Court **DENIES** the Motion to the extent it requests dismissal of Counts 6 and 7 of the Complaint, Power Home's claim for unfair and deceptive trade practices pursuant to N.C.G.S. § 75-1.1 and common law unfair competition.

G.   The Court **GRANTS** in part and **DENIES** in part the Motion to the extent it requests dismissal of Count 9 of the Complaint, Power Home's claim for tortious interference with contract.  The Court **GRANTS** the Motion and **DISMISSES** with prejudice the claim for tortious interference with the Noncompete Provision and the Non-Solicitation Provision.  The Court **DENIES** the Motion as to Power Home's claim for tortious interference with the Nondisclosure Provision.

H.   The Court **DENIES** the Motion to the extent it requests dismissal of Count 8 of the Complaint, Power Home's claim for civil conspiracy.

I.   The Court **GRANTS** the Motion to the extent it requests dismissal of Counts 10, 12, and 13 of the Complaint, Power Home's claims for relief titled as (1) Count X for "Turnover of Property to [Power Home] and for an Accounting against Defendants," (2) Count XII "Motion for Preliminary and Permanent Injunction" and (3) Count XIII "Punitive Damages Against Defendants," and **DISMISSES** these claims without

prejudice to Power Home's right to seek these remedies as it may be entitled.

123.   Upon entry of this Order and Opinion, the remaining claims in this action are: (1) Count 1, breach of the Nondisclosure Provision against Schram and Parrish; (2) Counts 3 and 5, trade secret misappropriation pursuant to the NCTSPA and the DTSA against Defendants, to the extent the claims are based on "customer names, customer contact information and customer buying preferences and history," Power Home's "confidential customer database, including the entire [Power Home] SalesForce database, and [Power Home] proprietary quote software, confidential sales memos, [and] sales training manuals;" (3) Count 11, unjust enrichment against Defendants; (4) Count 9, tortious interference with the Nondisclosure Provision against Sigora and Hall; (5) Count 6, unfair and deceptive trade practices pursuant to N.C.G.S § 75-1.1 against Defendants; (6) Count 7, common law unfair competition against Defendants; and (7) Count 8, civil conspiracy against Defendants.

**SO ORDERED**, this 18th day of June, 2021.

/s/ Michael L. Robinson
Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases